The first matter for argument this morning is Marie Gillespie v. Regional Care Hospital Partners, Inc. Mr. Geary? Mr. Geary, the spelling of the appellant's name is different from what I'm used to, which would be Gillespie with an E. Is it pronounced Gillespie? Gillespie, Your Honor. It is pronounced Gillespie? Yes. Thank you for the clarification. May it please the Court, good morning. My name is Noah Geary for Appellant Nurse Gillespie. I would like to reserve two minutes for rebuttal, please. Granted. I'm sorry, I didn't quite hear what you said totally. I'm sorry. Okay, the M-CARE Act. Yes, sir. You're not now saying that the M-CARE Act applies to any of your clientele protections? M-C-A-R-E? That is correct. Okay, which is different than your argument in the district court. Well, what I did was, I initially did not think the M-CARE Act applied when I analyzed the case. I did move to amend my complaint and that amendment was denied. Okay. Because there is a provision there which seems to me to be right on target and gets on the whole issue of what constitutes a report. Because it protects someone who threatens to take the kind of action that your client is arguing that she was retaliated against for taking. It's broader than I'm told it appears to be. In my opinion, Your Honor, the M-CARE Act anti-retaliation provision, it's very narrow. Yes, sir. And it's limited to a serious event or an incident. Okay. Now here at count five of the complaint, Nurse Gillespie alleged that she was fired for telling the truth to the Department of Health investigators. Your position is and, am I correct, has been that this was, what occurred here, was neither an incident nor a serious event pursuant to the statute. Is that right? That is correct. So if that is the case, then that takes the M-CARE Act out of the game. Is that right? Correct. Other than it could constitute a source of public policy. Well, but we're asking, I understand that. Yes. And coincidentally, I remember clearly when a case bearing your name, Gary, came down from the Pennsylvania Supreme Court and established a public policy exception. But we're not there yet. The first count of your complaint is a claim under MTALA. Is that right? Yes. And I'm curious as to how you are proceeding under MTALA. Would you agree that the success or failure of your MTALA claim comes down to how this panel interprets the VERB report in the statute? I think it comes down to that, plus a construction of the November 1st, 2012 letter that Nurse Gillespie gave to the CEO of the Descendants. Why would that be consistent with what my report is? Isn't that the same thing? Well, it's our position that... The letter is a report, you're saying? Correct. Right. But that's not an additional issue. That's not a legal issue. We must first determine the breadth or narrowness or definition, if you will, of report before we can decide what anything here actually is. And I assume everyone would agree that what your client filed in September about 11 months after the episode here with the Department of Health was a report. Yes. It's a written document directed to the Department. But none of that happened in the wake of the October, what was it, 24th episode? Correct. So explain for me, if you would, what transpired until the time well after termination that what we can agree was a report was filed actually constitutes a report for MTAL purposes? How did what occurred and what your client said or did in the wake of the October, 24th incident and prior to the formal report constitute an MTAL? Sure. Thank you. It constituted reporting, I should say, under MTAL because there is some significance to the fact that this is a verb as used in this statute and not a noun as used in some of these. Yes. Report under the MTAL statute, my position is it is ambiguous. It does not state whether it has to be verbal or in writing, to whom made, or within a certain period of time. I may have forgotten, believe me, but did you argue ambiguity in your brief? It's been a while since I've read your brief and that's a distinct and discreet legal issue. Have you argued ambiguity? No, is the answer to that question. I can recall it. I can't recall it. Is it your position that you don't need to go there and that your position is that your client made a report at the meetings with her supervisor and submitted the letter a couple of weeks later? Is that your bottom line? Yes, because the definition looking at Webster's dictionary is the case to say, well, in ordinary meaning, if a word is ambiguous, look to its ordinary meaning. Well, I think we've just established that you didn't argue ambiguity. So we're simply talking about defining or interpreting a statute. Okay? Right? Yes, sir. I mean, something isn't necessarily ambiguous just because we need to resort to a dictionary for assistance in interpreting a statute. Well, I thought the case would say that if it's unambiguous, just what the statute says, the court need look no further than anything else. What do you do that shouldn't be elevated? It's been a court case where they did define the term report as in Black's legal dictionary. Webster's, I believe, too. Correct. And the definition in Webster's of report is merely the giving of information. To whom? It doesn't state that in Webster's. But the same court did. Give information or notification or an official or formal statement of facts or proceedings. Correct. It's in the alternative. One seems to be an informal report and the other seems to be formal. The informal report would be the giving of information or notification. How did Ms. Gillespie do anything prior to the formal report of September of the following year that was more than simply opposition to, at best, what the hospital was doing or not doing? Because she was tasked with finding out, did we violate EMTALA or not? And so she gave a report verbally at these two meetings to the CEO. You just put the rabbit in the hat. That's not an answer. Using the word report in your response is not an answer. How is opposition a report? Well, it's my position Nurse Gillespie did both. She reported and then she opposed the directed cover-up. So it was in three steps. She reported an EMTALA violation. Cindy Cowley, the CEO, directed a cover-up and said we had two recent EMTALA issues here. We're not reporting this as an EMTALA violation. We're going to say it wasn't. And then Nurse Gillespie protested the cover-up. So first she reported the EMTALA violation. What does the record show she protested a cover-up? What does the record say about that? Well, it is at page, it's volume two, pages 206 and 207 of appellant's appendix. And, I'm sorry, 206 and 207. And if I may, there was a discussion. This is Nurse Gillespie's deposition. I did say it's better to be on the side of safety and report it because they're going to find out anyway, meaning the Department of Health. Wasn't the hospital already aware of this conduct? Yes, ma'am. When you say report, was it more of what new information? I think that's one of the issues Judge Hornak grappled with. What new information did she provide the powers that be at the hospital? So what did she report? What new information did she convey? She was tasked with reporting whether or not there was an EMTALA violation. That's not an answer, Mr. Geary. So she reported to Cindy Cowley after interviewing two of the nurses, one who dealt directly with the pregnant mother and a second nurse, the charge nurse. She reported an EMTALA violation. Mr. Geary, you have been asked directly by my colleague how did what Ms. Gillespie did impart any new information, any additional information, anything that the hospital director or officials already didn't know? Well, the CEO, the hospital director, learned of this from Ms. Cowley. In the O'Connor v. Jordan hospital case, it was the same. She learned of it from Ms. Cowley? I'm sorry? You said she learned of it from Ms. Cowley, not from your client. That's what you just said. No, I may have misspoke. I'm sorry. Ms. Cowley learned there was an EMTALA violation from Nurse Gillespie. Even in the O'Connor v. Jordan hospital case, it was the other hospital. So we're taking care with how we characterize things here. You say that Ms. Cowley learned that there was a violation. In fact, eventually it was determined there was not an EMTALA violation, right? Well, that was the hospital's position. Of course it was the hospital's position. Did anyone determine in the Department of Health, which came on the spot pretty quickly, right? Within two days? Hospital No. 26? Well, the Department of Health came within two days on a separate issue involving a different patient care issue, not this issue. You're talking about the ER episode? Correct. The LS episode. Right. Count 5 dealt with the patient initials LS, and the Department of Health happened to show up two days after this situation involving patient LS, which was something that happened in July of 2012. Yes. All right. So it's the giving of information. There's nothing in report to say, well, the CEO already knew this. Ms. Gillespie reported it verbally and then in writing by the November 1, 2012, letter. Where in the record, because you're probably asserting that a lot of what you're asserting in your brief is unsubstantiated, much of it does not have any say to the record. Where in the record can you point to anything that would establish that your client gave new information to Cowley, during either the October 24 meeting or the October 25 meeting? Page 206 and 207 of Volume 2 of Appellant's Appendix. Mr. Geary, you rely in your brief upon the O'Connor case, which was cited also by the magistrate judge and by Judge Hornack at the district court. O'Connor, in turn, mentions Schindler Elevator, which has been referred to by Judge McKee. In what way does O'Connor help you here? First of all, recognizing the obvious, which it is simply a district court decision and not precedential. Because it was found that the plaintiff in O'Connor made a report under EMTALA merely by informing her supervisors. And that's what Nurse Gillespie did here. O'Connor filled out a form to CMS, but it was not sent by her. It was sent by someone else. Interestingly, you have not relied upon, nor even cited to or listed in your table of authorities, the Schindler Elevator case. But you write in your brief, and this is at page 20 of your brief, that the O'Connor case, quote, would be under Title VII to determine what constitutes protected activity under EMTALA. Yes. This is not a question. I would suggest to you that you go back and reread O'Connor to determine where it instructs anywhere that it's appropriate to look to such cases. Do you have any other questions? Thank you. We'll have you back for rebuttal. Ms. Presley? Good morning. May it please the court, Marla Presley on behalf of Apoese. So obviously you can tell the panel is grappling with how to define reports to, or the verb report, not the noun report. And some of the dictionary definitions do strike me as being a bit tautological. To report means to report. That's not terribly helpful. So in the context of this case, how should this panel resolve that very important issue? In the context of this case, noting that EMTALA utilizes the word report as a verb, the court should define report as to give a statement of facts. To whom? Okay. Go ahead. Go ahead. To whom does the report go? In EMTALA, it is undefined. It's not specified to whom that report must be. And for purposes of this case, it doesn't necessarily matter. So is it just to a supervisor? My concern is that in the ultimate world of bad hospital management, and I'm not suggesting any of the people here involved fit this categorization, but if you really wanted to make sure that either the Pennsylvania Safety Authority or the Joint Commission ever found out about any bad stuff going on in your hospital, as soon as the head of the hospital got wind that an employee was about to call the Patient Safety Authority or call the Joint Commission, the person is called in, is going to make that call, and is fired. And the chief executive officer says something like, I hear you're about to call the JCO. You're out of here. And the report was never given in your view of things. So the whole purpose of EMTALA is defeated because you never allow the information that would constitute a report to get to the authority. It's a threat, and that's why the Whistleblower Act, that I started out with, seems to head that off. And maybe your argument is, well, the fact that threat is in the Whistleblower Act, and it's not in EMTALA, tells us something about what kind of was intended in EMTALA. That's a long about exposition of a question. But does that make sense to you? The concern is, if you're right, what do we do in a situation where somebody is clearly retaliated against because they tell the supervisor, I'm going to call JCO, and I'm going to call the Patient Safety Authority? I would say, Judge McKee, that MCARE is a far more broad statute, and EMTALA is narrowly drafted to protect one type of hospital violation, patient dumping. Here, under EMTALA, it doesn't, the act of reporting, even if you take a broader approach, the act of reporting to a supervisor, assuming that that would be a protected activity, nevertheless, doesn't cover what Ms. Gillespie did here, which is simply oppose a decision as to what to do next. You're suggesting that it's not necessary in deciding this case for this court to reach the question, which probably would, given the plain language of the statute, create some problems for you, because the statute says, reports a violation of a requirement of this section. It doesn't limit it to a public entity. It doesn't limit it to some kind of governmental body or board. So leaving that open suggests that if, in fact, what someone has done is report, it may be to some internal entity or inspector or authority. Even ruling out the requirement that someone go to an outside agency, looking at the plain language. Which is not, you agree with me, it ain't in the statute. It's not in the statute. What Ms. Gillespie did here, the common usage of the word report in the verb tense, looking to Webster's Third Dictionary, that means to give a statement of facts. Tied with the language of EMTALA, the whistleblower provisions require that a person provide a statement of facts that an EMTALA violation occurred. At best here, what Ms. Gillespie did was oppose the decision to not report. That statement of fact would have been a conclusion based upon the facts that everybody knows. So gather the chief medical folks together in a room. They all know that Dr. X either did or did not do something. But they think, well, you know, this is really not so consequential that we need to make a report. And one person in my group says, well, I really disagree. I studied this area of medicine for a long time. I think what happened here was a blatant violation of our obligations to provide safe and thoughtful care for the patient. And they say you're wrong. You're not conveying any new information. But in a sense, the person is saying that what happened here is, we'll call it an EMTALA report. It might not have been EMTALA, but let's assume it's under EMTALA, the kind of negligence, not in the technical medical malpractice sense. You're saying that kind of information would not be protected. The person could be fired and there would be no protection. It would depend on the substance of the information provided. If a person is in a room and says, we've committed an EMTALA violation, without more, because no facts have been conveyed, that person would not be. That's my point. Why did you convey facts? I don't know. I'll start with a rare disclaimer, which is going to make my colleague C.J. Seuss very happy. Let me start with this hypothetical. It does not suggest I know what I'm talking about. But let's just suggest there are two kinds of sutures that can be removed for an operation. One suture is the kind that is absorbed by the body very, very quickly. And the other suture is the kind that is longer, lasting, and more durable. You might have to go ahead and remove it. And for the kind of surgery involved, the first kind of suture is used. And so the person says, you know, what the doctor did with this kind of suture is just not safe. This is a real problem because the wound is going to open up again. The suture is not going to bind it. I think that's a violation. Now, there's no new information conveyed there. But the person says, I think that there's been a violation that has to be reported. So what is the hangup with information as opposed to how one views the information? Because the word report can't be viewed in isolation. It has to be read in with the language of the statute, to report a violation of EMTALA. And more hypothetical, that actually proves the point. Because now, Justice Gorchis said in the Banner Health decision, even if you report something that you believe to be a violation, that is certainly a patient safety violation, in that case it was patient hoarding, unless it's a violation, if true, under EMTALA, then you are not a protected whistleblower. So the facts are critical to determine whether the Whistleblower Act applies. If you take your hypothetical and say, we violated EMTALA because we utilized the wrong sutures, even if you believe that to be a serious medical error, because the utilization of wrong sutures is not a prohibited conduct under EMTALA, it's only patient dumping, then that's not a whistleblower under the statute, and how the statute has been interpreted. Let me back up for a minute. Is it your position, or do you concede, that there's no need to report externally, that an internal report would satisfy EMTALA? Do you concede that? I concede that no court has addressed whether or not it has to be externally, even here. Going back to Justice Gorsuch's opinion in Banner Care, that was an internal report. That's correct. And Justice Gorsuch, then Judge Gorsuch of the Tenth Circuit, found no fault with that, right? So he went on to analyze the case, assuming or tacitly implying that this was a report, an internal report was a report that satisfied EMTALA. Is that correct? That's correct. And that's the best authority we have. I couldn't find anything else out there. That's true. The O'Connor v. Jordan Hospital doesn't necessarily specify that. That was a district court opinion. This is an opinion written by now Justice of the Supreme Court. That's correct. And you would agree that a fair reading of that makes it clear that an internal report satisfies EMTALA? I agree. Right. But your position, once again, is we don't have to reach that question. That's right. Because what Ms. Gillespie said in this situation is, I think it's better that we side with safety and report because they're, the Department of Health, going to find out anyway. Who conveyed the information to the powers that be that the woman showed up at the hospital with vaginal bleeding, abdominal pain, and passing tissue? Who provided that information? The original report came in to the hospital from Uniontown Hospital. Two nurses and a plethora of senior management at the hospital received that information before Ms. Gillespie ever even knew that a complaint has been made. And Ms. Gillespie testified, it's in the record on page 201, not that she told Ms. Cowley that there was a violation of EMTALA, but that she was unaware how Ms. Cowley found out that there had been a violation. Was any determination made by anyone or any entity or any body that an actual EMTALA violation occurred here? What does the record show? The record shows a report coming down from the Department of Health, and admittedly you have to look at the reference number of Ms. Gillespie's complaint to the Department of Health and the response that only references that same reference number. The Department of Health ultimately determined that no EMTALA violation had been made. Notably, EMTALA doesn't have a self-reporting requirement. So by Ms. Gillespie saying, I oppose the decision to not report, that's not reporting an EMTALA violation. The obligation is on the receiving hospital, Uniontown Hospital, to report what it reasonably believes to be an EMTALA violation. And Uniontown Hospital also determined that no EMTALA violation happened. So your argument, your position of this is that the whole thing about LS is really just a way of hearing anyhow, because even if what happened with LS is a problem, it wouldn't be an EMTALA problem. LS is not an EMTALA problem, and I don't believe that Mr. Geary is asserting that it is. I believe that those allegations, LS fell under MCARE. And here, to that point, to MCARE, it's alleged in the complaint that the care of ER, LS, GM, and ME could have violated MCARE. MCARE is a statute that's designed to ensure quality health care to all of the residents of Pennsylvania and has these specific reporting requirements associated therewith. And it covers incidents, which are near misses, and accidents, incidents of serious events where there was care. And these two, or I'm sorry, these four cases clearly fall under either the near miss or the miss. And because there's a statutory... Are there incidents? There are incidents. There are absolutely incidents. And I think what Judge Kelly correctly noted is that there's no evidence to show that they're not incidents. So taking all of the evidence as true and the light most favorable to Ms. Gillespie, there's no evidence that these fall somehow out of either the near miss or the miss. It's a broad, MCARE's a broad statute that encompasses all of these potential medical errors. Go ahead, please. So under EMTALA, if I understand you correctly, if somebody reports what they perceive as an EMTALA violation, and then the powers that be say there is no EMTALA violation, but they're fired as a result of having initially reported, there's no recourse because the determination was made there was no EMTALA violation? It's not the determination that is determinative. It's the reporting of factual information. Let's assume they do report factual information. Yes. And they're dismissed. Yes. And then the licensing authorities come to the conclusion there was no EMTALA violation. Is there no recourse under EMTALA for that person? That is an unanswered question by the appellate courts. But even if we take a broad approach and say an agency, the Department of Health, the Joint Commissions, CMS, all determine that no violation has been made or has occurred, even assuming that person is still covered, that person isn't Ms. Gillespie here. I get that. I get that. I understand your argument. I think a few places where the MCARE issue has been discussed, there may have been, whether it's in briefs or in the district court opinion, perhaps the former, the word preempt or preemption has been used just for clarity, not mere vocabulary. I mean, you would agree, would you not, that we're not in the realm of preemption, which has as its basis the supremacy clause, but what we're really talking about here is Pennsylvania's substantive law and what is or is not an exclusive remedy. That's correct. Early on in the motion to dismiss stage, there were arguments made by both sides and then addressed by the court about preemption. But here, the only issue is whether there's an adequate statutory remedy which would encompass these claims such that this court wouldn't have to write in some new public policy. Well, an adequate remedy that is an exclusive remedy, right? That's correct. And it is. The fact that the statute of limitations was blown and is no longer a remedy because of the actions of Ms. Gillespie doesn't make it any less of an adequate and exclusive remedy. In any event, that's all an M-CARE concern. That's right. You don't have to worry about that because it's just M-CALA. Not an M-CARE. In other words, your opponent is arguing M-CARE. Well, the M-CALA report, as I understand it, stems only from the treatment of one patient, ER. The other patients that Ms. Gillespie contends that she reported about would not be M-CALA under any reasonable... So I believe that there still must... I'm out of time. I'm finished. Go ahead. So I believe that the other three patients addressed by Ms. Gillespie would have to fall under M-CARE because they're not otherwise M-CALA violations. Thank you very much. Mr. Geary, we'll have you back on rebuttal. Chief Judge Smith, if I may address your suggestion, I reread O'Connor in my use of the word instruct in my brief. Bad choice of words, an overstatement. O'Connor versus Jordan, however, it's a fact, engaged in an analysis of whether the plaintiff engaged in protected activity. So it may not have instructed, but it did engage in a protected activity analysis, as did the other cases cited, about five of them on page 22 of my brief. Thank you. I don't want you to waste time. I just didn't want the suggestion that it was more authoritative than it actually was in terms of what it directed. Thank you. Second, if I may, my colleague defined report as, quote, to give a statement of facts. It's actually broader, and, again, it seems to be kind of a lesser, more informal notification, and then the second is more formal. What do you mean by notification? Well, the definition says, in Webster's Dictionary, which has been cited by the Supreme Court of the United States and the other courts around the country, a report is something that gives information or a notification or an official formal statement of facts or proceedings. So here, I think this clearly would fall under the first segment, a report is something that gives information or notification. I mean, it's not a high bar. It gives information. When did that occur? When did Ms. Gillespie give information? In the first two meetings, verbally. In the first two meetings, verbally, and then she did it again in writing in her November 1, 2012 letter. What was the information that she gave in the record? And we're back to 206 and 207. Yes. What was the information she gave? That there was an MTALA violation. That's a conclusion. That's not information. Again, we return to how did she offer, how did she present, how did she provide any information that all these players did not already have, and from which information they were discussing whether or not there was an MTALA violation. Because she was assigned to inform the CEO, did we violate MTALA or not?  It's getting bigger and bigger and bigger and bigger. So your position has to be, then, that it is merely her opposition that constitutes a report. Now, my position is Ms. Gillespie did two things. She made a report, and then she opposed and protested the directive cover-up of the violation. Because Cindy Cowie said, according to Ms. Gillespie. That was for a judge. The stripper asked him right after he began this, for you to give us the information that you're saying constitutes a report, and I assume this is in the October 24th meeting, but even if it's October 24th and 25th, what was the information? He asked her that question. The chief asked her to elaborate because we weren't answering that. Now we're back to that. What is the information? That an MTALA violation occurred. I know it's circular, but that's what she was tasked. She works for the quality department. The CEO wanted to know, did we break the law or not? I confess I'm not the sharpest knife in the drawer, but even after the third iteration of that, I think I understand what you're saying. To me it seems a little chronological. All right. Thank you. Thank you very much. And thank you, counsel. This is, in my experience, only the second MTALA case that I've dealt with, so it's always interesting to deal with something new. It's part of what makes this job still interesting. Thank you very much. We'll take it unnoticed.